UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LP BROWN, T&F OIL COMPANY, AND THE OXY GROUP, LLC | * * * | CIVIL ACTION NO.: 2:13-cv-04892 |
| | * | SECTION: L |
| v. | * | |
| | * | JUDGE: FALLON |
| JEFFREY TODD WAYCASTER, STEVEN FORD, AND BIG RIVER OIL FIELD SERVICES, LLC | * * * * | MAGISTRATE JUDGE: KNOWLES |

*********************************************************************

## AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, LP Brown, T&F Oil Company, and The Oxy Group, LLC, who respectfully file this Amended Complaint, presenting allegations and causes of action as follows:

### The Parties

1.

Plaintiff, LP Brown, is an individual of the legal age of majority who is a resident of Mandeville, Louisiana.

2.

Plaintiff, T&F Oil Company, is a Louisiana limited liability company with offices in St. Tammany Parish.

3.

Plaintiff, The Oxy Group, LLC, is a Louisiana limited liability company.

4.

Made defendant herein is Steven Ford, an individual of the legal age of majority who is a resident of Mississippi.

5.

Made defendant herein is Big River Oil Field Services, LLC, a single-member limited liability company domiciled in Mississippi, with Steven Ford as its sole member, which at all pertinent times was authorized to do and doing business in the State of Louisiana and had a principal place of business in Vidalia, Louisiana.

6.

Made defendant herein is Jeffrey Todd Waycaster ("Todd Waycaster"), an individual of the legal age of majority who is a resident of Natchez, Mississippi, and member of the bar of the State of Mississippi who periodically worked out of T&F Oil Company's offices in Mandeville, Louisiana.

7.

Venue is proper in this court because, as alleged herein below, certain of the Defendants' actions took place in St. Tammany Parish and/or caused damages in St. Tammany Parish for failure to forward royalty payments to Plaintiffs in St. Tammany Parish.

## **CAUSES OF ACTION**

### **(Breach of Legal Employment Contract)**

8.

Todd Waycaster served as general counsel for LP Brown and T&F Oil Company, by virtue of a verbal employment agreement under which LP Brown and T&F Oil Company reasonably believed Mr. Waycaster to be their lawyer, thus establishing an attorney-client relationship, during the time period of 2006 through early 2011.

9.

During that time, Mr. Waycaster periodically worked out of T&F Oil Company's offices in Mandeville, Louisiana, sent correspondence to third parties from T&F Oil Company's offices in Mandeville, Louisiana, learned confidential information about the operations and business of LP Brown and T&F Oil Company that were conducted in St. Tammany Parish and Concordia Parish, Louisiana, regarding various oil wells, leases, and mineral rights, including, but not limited to, the Angelina Wells located in Concordia Parish, and learned confidential information about Mr. Brown's and T&F Oil Company's investors on various oil exploration projects, which investors were recruited at times by Mr. Waycaster from T&F Oil Company's Mandeville, Louisiana office.

10.

The information learned by Mr. Waycaster was confidential and protected by the attorney-client privilege imposed by operation of law and by Mississippi Rule of Professional Conduct 1.6, and thus Mr. Waycaster was contractually bound to not disclose that information to any third parties without the permission of LP Brown and T&F Oil Company.

11.

Neither LP Brown nor T&F Oil Company gave Mr. Waycaster permission to disclose confidential information to third-parties.

12.

During the approximate time frame of 2008 through 2010, Mr. Waycaster participated in numerous telephone conversations with (a) James M. Roberson, an oil and gas producer and operator with whom Mr. Waycaster, Mr. Brown, and T&F Oil Company had many dealings in the oil and gas industry, and (b) Jonathan Fontenot, a lawyer admitted to practice in Louisiana and who served as Mr. Roberson's attorney, the substance of which were audio recorded by Mr. Roberson and/or Mr. Fontenot.

13.

Plaintiffs were unaware of the existence of these recordings, and the acts, omissions, and misrepresentations by Mr. Waycaster described in the recordings, until February 2013, because they were part of a confidential investigative file kept by the Department of Environmental Quality.

14.

Plaintiffs only became aware of the substance of these recordings, and the acts, omissions, and misrepresentations by Mr. Waycaster described in the recordings, in 2013 when Mr. Brown and T&F Oil Company obtained the recordings.

15.

The following is a non-exclusive list of examples of the things that transpired during those recorded telephone conversations, wherein Mr. Waycaster:

(a) repeatedly divulged confidential information to Mr. Roberson and Mr. Fontenot;
(b) admitted that Mr. Brown was unaware Mr. Waycaster was having these conversations with Mr. Roberson and Mr. Fontenot;
(c) admitted that he had divulged confidential information to Mr. Fontenot even before Mr. Fontenot drafted and filed a lawsuit (*J-LU LTD CO., James M. Roberson a/k/a Jimmy Roberson v. Lobdell P. Brown, III a/k/a L.P. Brown, III, T&F Oil Company, LLC, and T,F&B Oil Company, LLC*, No. 10-18490, Cameron Parish,

3

Case 2:13-cv-04892-EEF-DEK Document 17 Filed 09/18/13 Page 4 of 14

Louisiana)(hereinafter referred to as "the J-LU lawsuit") on behalf of Mr. Roberson against Mr. Brown and before Mr. Fontenot took a default judgment against Mr. Brown and T&F Oil Company;

(d) admitted that a lawyer with the Plauche Nieset law firm in Lake Charles had become aware that Mr. Waycaster had been having conversations with Mr. Fontenot that breached Mr. Waycaster's obligation to Mr. Brown and T&F Oil Company to protect confidential information;

(e) admitted that "it would get me in hot water" to have spoken with Mr. Roberson and Mr. Fontenot even before the J-LU lawsuit was filed by Mr. Fontenot on behalf of Mr. Roberson; and,

(f) offered to Mr. Robertson to lie to Mr. Brown so Mr. Waycaster could obtain financial or material gain from Mr. Brown for Mr. Roberson and himself.

Additionally, during those telephone conversations, Mr. Roberson confirms that he knew Mr. Waycaster was Mr. Brown's lawyer.

16.

In the J-LU lawsuit, J-LU LTD and Mr. Roberson sought from Mr. Brown and T&F Oil Company a working interest in several oil leases, specifically the leases from Mermentau Land and Mineral and Mr. Gabe Nunez in the Little Chenier field, and revenues from the production of wells, specifically the Nunez #1 well, the Mermentau #1 well, and the Mermentau #2 well, operated on those oil leases.

17.

Mr. Waycaster breached his legal employment contract with LP Brown and T&F Oil Company when he divulged confidential information about Mr. Brown and T&F Oil Company to Mr. Fontenot even before Mr. Fontenot drafted the J-LU lawsuit.

18.

Mr. Waycaster breached his legal employment contract with LP Brown and T&F Oil Company when he failed to disclose to Mr. Brown and T&F Oil Company, who reasonably believed Mr. Waycaster to be their lawyer, the fact that the J-LU lawsuit was going to be filed and, later, in fact, was filed.

19.

After the J-LU lawsuit was filed, Mr. Waycaster breached his legal employment contract with LP Brown and T&F Oil Company when he advised Mr. Brown and T&F Oil Company that Mr. Waycaster had filed an Answer to the J-LU lawsuit when, in fact, he did not.

4

20.

As a result of Mr. Waycaster's breach of his legal employment contract, the J-LU lawsuit resulted in a default judgment being rendered against Mr. Brown and T&F Oil Company for (a) 50% working interest in several oil leases (specifically the leases from Mermentau Land and Mineral and Mr. Gabe Nunez in the Little Chenier field), (b) 50% of all revenues from production of the wells (specifically the Nunez #1 well, the Mermentau #1 well, and the Mermentau #2 well), and (c) $213,230.00 in favor of the J-LU plaintiffs.

21.

After the default judgment was entered in the J-LU lawsuit, Mr. Brown and T&F Oil Company hired the Plauche Nieset law firm to attempt to set aside the default judgment, thereby incurring legal fees and expenses to correct the damage done by Mr. Waycaster's breach of his legal employment contract with LP Brown and T&F Oil Company.

22.

When the default judgment could not be set aside, Mr. Waycaster served as Mr. Brown and T&F Oil Company's lawyer and advised Mr. Brown to enter into a settlement with J-LU LTD, CO. and Mr. Roberson for over $100,000.00.

23.

For the reasons set forth above, Mr. Waycaster is obligated to LP Brown and T&F Oil Company for (a) the value of LP Brown and T&F Oil Company's 50% working interest in several oil leases (specifically the leases from Mermentau Land and Mineral and Mr. Gabe Nunez in the Little Chenier field), (b) the value of LP Brown and T&F Oil Company's 50% interest in all revenues from production of the wells (specifically the Nunez well and the Mermentau wells), (c) the amount LP Brown and T&F Oil Company paid to Jimmy Roberson and/or his entities in settlement of the J-LU lawsuit, and (d) any defense costs incurred by LP Brown and T&F Oil Company to seek to set aside the J-LU default judgment.

**(Breach of Contract – A4/A1 Well)**

24.

The Angelina Farms field is a 120+ acre tract of land in Concordia Parish, Louisiana, encumbered by numerous oil and gas leases.

25.

In 2004, T&F Oil Company purchased the MCB#1 well and the A3 well.

26.

In 2006, Mr. Waycaster, pursuant to a verbal legal employment agreement, began performing legal work for LP Brown, T&F Oil Company and The Oxy Group and was involved in raising additional funds from investors to purchase the non-owned percentage of the MCB#1 and A3 wells and perforate and attempt to produce a deeper zone known as the Campbell Sands in the A3 well. In addition to receiving a salary for his legal work, Plaintiffs also assigned Mr. Waycaster a 1.5625% working interest in both wells as partial compensation for his legal work.

27.

After working with Mr. Waycaster for nearly four years to acquire leases at Angelina Farms, during the summer of 2010, LP Brown and T&F Oil Company acquired new leases to drill what was originally referred to as the A4 well, but was then renamed the A1 well by the State of Louisiana. (This well will be hereinafter referred to as "the A4/A1 well.")

28.

Pursuant to these new leases, T&F Oil Company was to drill the A4/A1 well.

29.

During these nearly four years, Mr. Waycaster, as the attorney for LP Brown and T&F Oil Company, worked on, reviewed, and negotiated terms of the new A4/A1 leases, much of which occurred at T&F Oil Company's office in Mandeville, Louisiana.

30.

Don Weiss, Esquire, a lawyer in Shreveport, served as the representative for Angelina Farms in the negotiation of the leases on the A4/A1 well acreage, until his death.

31.

Thereafter, Don Weiss's son, Eric Weiss, on behalf of Angelina Farms, handled the negotiation of the leases on the A4/A1 well acreage to LP Brown and T&F Oil Company, as well as the leases on the A3 well acreage to The Oxy Group.

32.

The A4/A1 and A3 leases were timely recorded in the mortgage records of Concordia Parish.

33.

In or around September 2010, T&F Oil Company entered into a written drilling contract with Big River whereby Big River would receive cash compensation plus a 25% working interest

in the A4/A1 well in return for building the location for the well and drilling the well to a total depth of 6,900 feet.

34.

Big River achieved total depth in January 2011, and, thus, pursuant to the terms of the written drilling contract, became a 25% working interest owner in the A4/A1 well.

35.

On or about September/October 2010, Mr. Waycaster accepted legal employment by Big River, which, along with Mr. Waycaster's prior employer, T&F Oil Company, was a working interest owner in the A4/A1 well.

36.

In August 2011, and with the assistance of Todd Waycaster, Steven Ford and Big River demonstrated their desire to own the Angelina field when they offered LP Brown and T&F Oil Company $300,000 plus a 11.25% overriding royalty to take over T&F Oil Company's operations at Angelina Farms and the working interest owned by LP Brown and T&F Oil Company in the Angelina field.

37.

Throughout 2011, through the efforts of both Mr. Waycaster and Mr. Ford, Big River engaged in negotiations to top-lease the A4/A1 well, while still remaining a working interest owner in the primary lease, with T&F Oil Company and Mr. Hugh Brashier and others making up the remaining working interests.

38.

In fact, in early 2011, both Mr. Waycaster and Mr. Ford specifically told Mr. Hugh Brashier that they intended to own the A4/A1 well leases outright, to the exclusion of LP Brown and T&F Oil Company, but that Mr. Brashier's ownership interest would be returned to him.

39.

More specifically, in early 2011, Mr. Waycaster and Mr. Ford specifically told Mr. Brashier that they planned to get the A4/A1 leases placed into a third party's name who would then assign the leases back to Mr. Ford and Mr. Waycaster so that they would own 100% of the leases on the well, all the while assuring Mr. Brashier that he need not worry because his working interest would be granted back to him, but that LP Brown's and T&F Oil Company's working interest would not be granted back to them.

40.

In March 2011, Big River breached the terms of the primary lease when it failed to pay its portion of the invoiced completion costs and when they told the other working interest owners on the A4/A1 well, including, but not limited to, Mr. Brashier, to not pay their portion of the invoiced completion costs on the A4/A1 well, which resulted in the working interest owners not paying their portion of the invoiced completion costs.

41.

As a result of the Defendants and the other working interest owners not paying their portion of the invoiced completion costs, T&F Oil Company was unable to complete the well and put the well online within the required time-frame under the primary lease, which resulted in the primary lease on the A4/A1 well lapsing.

42.

When the primary lease lapsed, the top lease held by Big River dropped down to become effective on the A4/A1 well, to the exclusion of LP Brown, T&F Oil Company, and the other working interest owners in the primary lease on the A4/A1 well, and to the exclusion of any holders of overriding royalty interests in the well pursuant to the primary lease, such as LP Brown.

43.

While Big River was only a partial working interest owner in the primary lease on the A4/A1 well, it was a 100% working interest owner in the top-lease that dropped down to take effect once the primary lease on the A4/A1 well lapsed.

44.

Big River breached the primary lease by failing to pay its portion of the invoiced completion costs and by telling the other working interest owners in the primary lease on the A4/A1 well to not pay their portion of the invoiced completion costs, thus resulting in a lapse of the primary lease due to non-completion, and causing the top lease to drop down, increasing Big River's working interest in the well and excluding all prior working interest owners, including, but not limited to, LP Brown and T&F Oil Company, and excluding any holders of overriding royalty interests in the well pursuant to the primary lease, such as LP Brown.

45.

Because the primary lease on the A4/A1 well lapsed due to the breach by Big River, the Defendant, Big River, is obligated to Plaintiffs, LP Brown and T&F Oil Company, for their lost working interests and overriding royalty interests in the well, and the resulting loss of revenue, income, and royalties due under the primary lease, which damage began in February 2012 and continues through the present, all in an amount that will be proven at trial.

(Fraud – A4/A1 Well)

46.

Plaintiffs reiterate the allegations contained in paragraphs 24 through 45, as if copied here *in extenso*.

47.

In addition to the allegations in paragraphs 24 through 45 constituting breach of contract, they also constitute fraud for the following specific and particular reasons:

48.

Throughout 2011, through the efforts of both Mr. Waycaster and Mr. Ford, Big River engaged in negotiations to top-lease the A4/A1 well, while still remaining a working interest owner in the primary lease, with T&F Oil Company and Mr. Hugh Brashier and others making up the remaining working interests.

49.

In fact, in early 2011, both Mr. Waycaster and Mr. Ford specifically told Mr. Hugh Brashier that they intended to own the A4/A1 well leases outright, to the exclusion of LP Brown and T&F Oil Company, but that Mr. Brashier's ownership interest would be returned to him.

50.

More specifically, in early 2011, Mr. Waycaster and Mr. Ford specifically told Mr. Brashier that they planned to get the A4/A1 leases placed into a third party's name who would then assign the leases back to Mr. Ford and Mr. Waycaster so that they would own 100% of the leases on the well, all the while assuring Mr. Brashier that he need not worry because his working interest would be granted back to him, but that LP Brown's and T&F Oil Company's working interest would not be granted back to them.

51.

In March 2011, Todd Waycaster and/or Steven Ford began to carry out this fraudulent scheme when they both told investors in the A4/A1 well, including, but not limited to Mr. Hugh Brashier, a working interest owner in the well, to not pay their completion costs. As a result, the investors did not pay.

52.

Because the investors did not pay the completion costs, the well was not completed.

9

53.

Because the well was not completed, the primary lease lapsed.

54.

Because the primary lease lapsed, the top lease dropped down to become effective.

55.

Big River, which owned a working interest in the A4/A1 well by virtue of the drilling contract entered into with T&F Oil Company, had a fiduciary duty to its fellow working interest owners under the primary lease to keep that lease in place.

56.

By being parties to both the primary lease and the top lease, Big River, Mr. Waycaster, and Mr. Ford, engaged in a conspiracy to commit fraud, and did commit fraud, when they told the working interest owners in the primary lease to not pay their completion costs, because such action resulted in the primary lease lapsing and causing the top lease to drop down and become effective, thus causing LP Brown to lose his overriding royalty interest in the well and T&F Oil Company to lose operation of and its working interest in the well, and instead put Big River into the position of operator of and working interest owner of the well on better terms than it had as working interest owner under the primary lease.

57.

Because of the above-described fraud, the Defendants are obligated to Plaintiffs, LP Brown and T&F Oil Company, for their lost working interests and overriding royalty interests in the well, and the resulting loss of revenue, income, and royalties due under the primary lease, which damage began in February 2012 and continues through the present, all in an amount that will be proven at trial.

**(Breach of Contract – A3 Well)**

58.

The A3 well was originally drilled in 1975.

59.

In 2004, T&F Oil Company purchased the A3 well and the leases associated with it, and served as both operator and lessee.

60.

The A3 well was a commercially productive oil well until August 2010, when the pumping unit on the A3 well cratered.

61.

On November 10, 2010, LP Brown and T&F Oil Company entered into a written contract with Big River to transport another pumping unit owned by LP Brown and install it on the A3 well in place of the cratered pumping unit. Big River agreed to perform this work in return for being given ownership of the cratered pumping unit that was previously on the well.

62.

The replacement pumping unit should have been installed by the end of November 2010, since the agreed upon work was a two-day job, but Big River breached the contract by unreasonably delaying the installation of the replacement unit to the point that T&F Oil Company's lease on the well lapsed in April 2011 due to non-production.

63.

Had Big River not breached the contract to transport and install the replacement unit, T&F Oil Company would still be the operator and lessee of the A3 well today.

64.

As a result of Big River's breach of the contract to transport and install the replacement unit, the Defendants are obligated to Plaintiffs, LP Brown and T&F Oil Company, for loss of revenue, profit, and royalties, all in an amount that will be proven at trial.

**(Fraud – A3 Well)**

65.

Plaintiffs reiterate the allegations contained in paragraphs 58 through 64, as if copied here *in extenso*.

66.

In addition to the allegations in paragraphs 58 through 64 constituting breach of contract, they also constitute fraud for the following specific and particular reasons:

67.

Big River, Steven Ford, and Todd Waycaster knew that the pumping unit on the A3 well had cratered, thus rendering the well temporarily non-productive. They knew this because they,

11

on behalf of Big River, had negotiated the contract to transport and install the replacement unit for the A3 well.

68.

Further, Big River, Steven Ford, and Todd Waycaster knew from their experience and familiarity with the Angelina leases that non-production of a previously producing Angelina well for over 90 days would cause the lease on the well to lapse, and thus they knew that time was of the essence in fulfilling the terms of the contract to transport and install the replacement pumping unit.

69.

Additionally, Mr. Waycaster knew by virtue of his prior representation of LP Brown and T&F Oil Company that LP Brown did not willingly relinquish any of his or T&F Oil Company's rights in any productive well, such as the A3, which had been productive for T&F Oil Company since 2004.

70.

Thus, knowing that LP Brown and T&F Oil Company would not willingly allow a lease to lapse, Big River, Steven Ford, and Todd Waycaster formed a plan to delay the installation of the replacement unit on the A3 well long enough for there to be non-production on the A3 well for over 90 days.

71.

As a result, when Big River contracted with T&F Oil Company to transport and install the replacement pumping unit, Big River, Steven Ford, and Todd Waycaster intentionally and fraudulently delayed the installation of the replacement pumping unit long enough so that T&F Oil Company's lease lapsed, thus creating an opportunity for Big River, Steven Ford, and Todd Waycaster to obtain a lease for the A3 well, which they knew had been producing for T&F Oil Company since 2004. They had this knowledge by virtue of Todd Waycaster serving as general counsel for T&F Oil Company as well as by virtue of Todd Waycaster being a 1.5625% working interest owner in T&F Oil Company's lease on the well.

72.

However, after T&F Oil Company's lease lapsed but before Big River, Steven Ford, and Todd Waycaster could obtain a lease on the A3 well, LP Brown, through another of his companies, The Oxy Group, leased the A3 well and properly recorded that lease in the mortgage records of Concordia Parish.

73.

Despite this recordation, Todd Waycaster and Steven Ford, in February 2012, misrepresented to Don Weiner, Esquire, a Louisiana lawyer in Shreveport, Louisiana, who represented Angelina Farms, that the A3 lease was open and thus obtained a lease on the A3 well in favor of Big River, despite the fact that the A3 lease acreage was already leased to The Oxy Group, a fact that was known to Mr. Waycaster and Mr. Ford since the A3 lease to The Oxy Group was recorded in the mortgage records of Concordia Parish.

74.

After obtaining the lease on the A3 well, Mr. Waycaster and Mr. Ford conspired with Mr. Wendel Walker, the farm manager of Angelina Farms, to prohibit ingress and egress by LP Brown, T&F Oil Company and The Oxy Group to the A3 well, thus making it impossible to complete the work necessary to maintain the leases that The Oxy Group rightfully possessed, thus causing The Oxy Group's lease on the A3 well to lapse.

75.

As a result of the allegations in paragraphs 65 through 74, Defendants are obligated to Plaintiffs, LP Brown, T&F Oil Company, and The Oxy Group for loss of revenue, profit, and royalties associated with the A3 well in an amount that will be proven at trial.

**(Breach of Legal Employment Contract – A3 Well)**

76.

In addition to the above fraudulent acts, Mr. Waycaster, by negotiating with Mr. Weiner for Big River to lease the A3 well, Mr. Waycaster took an adverse position to a former client and, thus, violated the Mississippi Rules of Professional Conduct governing lawyers in that State, including but not limited to Mississippi Rules of Professional Conduct 1.6, 1.7, 1.8, 1.9, 5.5, and 8.4, and thus breached his legal employment contract with LP Brown and The Oxy Group, resulting in a loss of revenue, income, and royalties by LP Brown and The Oxy Group, for which Mr. Waycaster is obligated.

77.

Plaintiffs are entitled to all other damages arising out of the above actions, which damages will be proven at trial, along with legal interest, costs, penalties, and attorneys fees.

78.

Plaintiffs request a trial by jury.

WHEREFORE, Plaintiffs, LP Brown, T&F Oil Company, and The Oxy Group, LLC, pray that Defendants, Todd Waycaster, Big River Oil Field Services, LLC, and Steven Ford, be served with a copy of this Amended Petition through their counsel of record and be duly cited to appear and answer same, and after due proceedings are had, there be judgment herein against the Defendants awarding Plaintiffs such damages as are reasonable, plus legal interest, costs, penalties, and attorney's fees, and all other relief determined to be just and equitable by this Court.

**PAJARES & SCHEXNAYDRE, L.L.C.**

BY: /s/ David J. Schexnaydre
DAVID J. SCHEXNAYDRE, T.A.
Louisiana State Bar Association No. 21073
68031 Capital Trace Row
Mandeville, Louisiana 70471
Telephone: 985-292-2000
Facsimile: 985-292-2001
Email: dschexnaydre@pajares-schexnaydre.com
Counsel for Plaintiffs, LP Brown, T&F Oil Company,
and The Oxy Group, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2013, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

/s/ David J. Schexnaydre
DAVID J. SCHEXNAYDRE